TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0425-KB

FRED GARLAND GREENE                                          MOVANT

V.                          IN SUPREME COURT

KENTUCKY BAR ASSOCIATION                              RESPONDENT

## OPINION AND ORDER

This case is before the Court upon the Movant Fred Garland Greene's motion for reinstatement under SCR 3.510(2). His KBA Member Number is 26890 and his bar roster address is PO Box 490, Russellville, KY 42276. The Character and Fitness Committee (the Committee) issued its Findings of Fact, Conclusions of Law, and Recommendation to the Board of Governors, recommending that Greene not be reinstated. The Board of Governors took issue with some of the Committee's analysis but adopted all other Findings and also recommends that this Court deny Greene's application for reinstatement. Having reviewed the record, we follow the recommendations of the Committee and Board and deny Greene's application for reinstatement.

## I.     Facts and Procedural Posture

Greene was admitted to the practice of law in 1972. Since that time, this Court has temporarily suspended him from the practice of law on three different occasions. *Kentucky Bar Ass'n v. Greene,* 386 S.W.3d 717 (Ky. 2012) (30-day suspension and public reprimand); *Greene v. Kentucky Bar Ass'n,* 499

S.W.3d 687 (Ky. 2016) (180 day suspension with 61 days probated for one year); *Greene v. Kentucky Bar Ass'n,* 568 S.W.3d 349 (Ky. 2019) (three-year suspension retroactive to March 1, 2017). Pursuant to SCR 3.502, a lawyer suspended for more than 181 days must undergo a reapplication process and cannot be reinstated to the practice law except by order of this Court. During this process, "[t]he burden of proof shall rest upon the Applicant to prove by clear and convincing evidence that he/she possesses the requisite character, fitness and moral qualification for re-admission to the practice of law." SCR 3.502(5). Because it was the three-year suspension as a result of the 2019 decision against Greene, the underlying facts of that case are relevant to our disposition here.

A brief review of Greene's past misconduct will suffice. Two charges pertained to Greene being paid $800 to represent a client "in a pending domestic relations matter. He did not deposit the cash into an escrow account and was suspended from practice at the time." 568 S.W.3d at 352. This action violated SCR 3.130(1.15)(a) and 3.130(5.7)(a)(5). In actions involving his former client, Peggy Violett, Greene had asked his son and daughter-in-law—Jim and Lara, both practicing attorneys in Kentucky—to attend a meeting at his law office with Violett. "Jim, Lara, and Violett were unaware that Greene was suspended from the practice of law." *Id.* at 350-51. "Greene asked Lara to prepare an estate plan for Violett. After some correspondence regarding the matter, Lara learned that Greene was suspended from practice. Lara advised Greene she would no longer assist him in Violett's estate plan matter."

2

*Id.* at 351. Later, on May 26, 2017, Greene executed four documents for Violett: "a will, a power of attorney, a trust, and a health care surrogate. One of the witnesses to the will was listed as William Sandlin. However, it was not William who signed the will but his wife, Joyce, Greene's assistant. Greene notarized William's purported signature on the will." *Id.* Greene, however, backdated all these documents as if they had been signed on December 1, 2015. "Per Greene's request, Violett wrote him a check for $2,500 after the documents were executed. Greene took the check to the bank and cashed it that day." *Id.* Greene protested

> that prior to his suspension he had contacted his son, Jim, to assist with Violett's estate plan; that Jim indicated that he and his wife, Lara, would handle the situation; and that Jim and Lara were to prepare the documents. These statements were inaccurate. The Office of Bar Counsel sent Greene a letter and invited further response from Greene in light of the information and allegations in that letter. Greene provided the Office of Bar Counsel with a declaration in which he stated more than once he had told Violett of his suspension. This statement was also inaccurate. Greene returned the $2,500 to Violett.

*Id.* Greene's suspension therefore stemmed from his violations of SCR 3.130(3.4)(c), SCR 3.130(5.7)(a)(5), SCR 3.130(8.4)(b), SCR 3.130(8.4)(c), and SCR 3.130(8.1)(a).

During the time of his suspension Greene apparently lived with his ex-wife and adult son, who has special needs, on a small farm and performed all the work of a general farm laborer. He also sought to get an Emergency Substitute Certification from the Education Professional Standards Board (EPSB), in August of 2018. He used an email address of fgreeneatty@epbnet.com to submit his application. On his application, he

disclosed his prior 2016 and 2019 disciplinary matters to the EPSB, describing the circumstances as

> During 2015-2016 a technical issue arose involving the use of an escrow account. I used funds from the account with consent of the client. However, the client has not been found to this date. Therefore, I was left with no backup. The bar and I agreed to a 4 month suspension which would run November 2016 to March 2017.

This is a material misrepresentation of the facts. The discipline imposed in 2016 arose from Greene's failure to maintain a minimum balance in his escrow account to cover the various amounts owed to his client, Frank Doss. *Greene*, 499 S.W.3d at 688. Greene then took a personal loan from another client of $40,000 and deposited that money into the escrow account, thus "it is apparent that Movant borrowed the money so he could cover the deficiency in the Escrow account and cover amounts due to Doss as mentioned previously." *Id.* Therefore, there was no "technical issue" underlying his 2016 suspension. He violated SCR 3.130(1.15)(a) for "improper administration of his escrow account" and SCR 3.130(1.8)(a) for entering into a business transaction with a client. *Id.*

Additionally, Greene also disclosed to the EPSB the conduct surrounding his three-year suspension. He stated,

> I had a long standing client who I turned over to my son, daughter in law, and her father who are "experts" in estate planning. I told my son of my suspension on November 9, 2016. My son and daughter in law came to my office to prepare the documents for their client (my ex-client). The Bar claims, I was practicing law. I contend that this was my son and daughter in law's client since 2016.

Once again, this is a material misrepresentation of the facts. The facts were determined that neither Greene's son, Jim, Lara nor Violett, had been informed Greene was suspended from the practice of law as late as February 17, 2017. *Greene,* 568 S.W.3d at 350-51. Jim and Lara were never the attorneys for Violett. Greene, in fact, admitted to "knowingly making false statements of material fact in connection with a disciplinary matter, as specified above, when responding to the Inquiry Commission complaint and the Office of Bar Counsel regarding the Violett matter." *Id.* at 352. Thus, even during his suspension and despite his admission of wrongdoing, Greene continued to publicly adhere to a knowingly false account of the events underlying his three-year suspension.

Greene's application for a teaching certification was eventually denied for his failure to disclose his 2012 disciplinary matter and failing to inform the EPSB that he was suspended from practicing law until 2020. An Agreed Order, however, was entered that a teaching certificate will be issued to Greene once his license to practice law has been restored, and Greene can further meet the required academic standards.

On August 13, 2018, Greene submitted an application to be a teacher's aide to the Russellville Independent School System. On that application, he was asked if he had ever had a professional license revoked or suspended. He answered yes, explaining "I have been suspended for the practice of law for a minor issue and hope to have everything resolved by the end of October." The Character and Fitness Committee found this to be a material misrepresentation because Greene's response downplayed his misconduct and falsely implied his

5

suspension would be concluded in October of 2018. We also note that Greene's answer fails to disclose the 2012 suspension. Although hired as an aide, Greene was subsequently terminated from the position due to excessive punishment of a pre-school child.

### A. The Character and Fitness Committee's Findings and Recommendation

Greene filed his application for reinstatement to the practice of law on March 10, 2020 and completed his Character and Fitness Questionnaire in June of that year. One of the questions required Greene to list "every other application and examination taken by you for a license granted by a state or for an official position, the procurement of which required proof of good character . . . ." Greene answered "n/a". Thus, he failed to inform the Character and Fitness Committee of his application for a teaching certification with the EPSB, claiming at the formal hearing that he omitted the information due to the Agreed Order with the EPSB.

Greene was also asked to disclose any civil or administrative proceedings in which he was a party, as well as if he had ever been charged with "fraud, deceit, misrepresentation, forgery or other acts of dishonesty in any civil, criminal, administrative, or other proceeding?" Greene disclosed a lawsuit from the 1990s in which he was sued because he was a part-owner of a radio station at the time. He also revealed that he had been charged with twenty-two counts of felony Theft by Failure to make Required Disposition of Property over $100 in 1986. This last case, however, was dismissed with prejudice in 1987. The Character and Fitness Committee found Greene had failed to disclose eight

6

other lawsuits in which he was a party. One case involved an allegation that Greene had probated an incorrect will; another involved "problems with a charitable trust administered by" Greene; and a third case was a bankruptcy action in federal court. Greene stated he filled out his application during the Covid-19 pandemic at home, did not have access to all his files, and simply listed the cases he could remember.

Two other cases filed in 2021 involved two banks, Discover and American Express National Bank, alleging Greene owes $23,034.78 and $7,740.37, respectively. Greene stated he was unaware he needed to amend his application to include these last two cases. The application, however, required Greene to check a box signaling his acknowledgment that he "after the happening of any event, [will] immediately notify the Board by filing an amendment to this application as to any changes in respect to any matter regarding which information is herein sought, and also any incident which may have bearing upon any information sought."

At the formal hearing, Greene was asked to discuss the Violett matter and once again, he insisted on a false narrative of events, stating that he did not participate in the February 17, 2017 meeting and that he had told Violett that his son and daughter-in-law were her new lawyers.

Finally, three attorneys filed affidavits in support of Greene's reinstatement, James Milam, Kenneth Dillingham, and Steve Pitt. Another attorney, Steve O. Thornton, also wrote a letter in support of Greene. Greene's son and daughter-in-law, however, submitted affidavits recommending against

reinstatement. The KBA also submitted a letter Greene had written to both of them, which the Character and Fitness Committee summarized as, "stating they are 'dead to him,' blamed Jim for not lying for him, and blamed Lara for calling the ethics hotline and reporting the February 2017 incident."

Noting Greene's burden to produce clear and convincing evidence of his character, fitness, and moral qualifications for reinstatement,[1] the Character and Fitness Committee concluded, Greene's "recounting of the events surrounding his discipline, described in his EPSB application, shows a pattern of habitually minimizing or explaining away his wrongful conduct, despite the fact that he accepted a negotiated penalty for such conduct in the form of suspension of his law license." As for remorse and recognition of wrongfulness, the Committee found Greene "repeats a pattern of focusing on how the suspension of his license has affected him, while failing to display remorse or sorrow for the people he impacted with his misconduct." Greene's "failure to accurately describe his misconduct . . . shows he does not accept responsibility for the wrongfulness of his actions."

---

[1] The reinstatement standards are the nature of underlying conduct as basis for original suspension; compliance with terms of suspension; conduct during period of suspension that demonstrates trustworthiness and confidence of the public; sufficient professional capabilities to serve as a lawyer; good moral character; appreciation for wrongfulness of underlying conduct, including sense of wrongdoing and the seriousness of the misconduct, as well as rehabilitation from past misconduct; conduct and attitude towards the courts and the practice; time elapsed since suspension; and candor during the reinstatement process. SCR 3.503(1). Failure to meet any of these standards by clear and convincing evidence will suffice to deny reinstatement. SCR 3.503(2).

As to compliance with the terms of his suspension, the Committee focused on Greene's failure to inform Violett and his family of his suspension from the practice of law in 2017, stemming from his suspension imposed in 2016. The only conduct it cited as evidence of failure to comply with the terms of his 2019 suspension was his use of an email address that contained the abbreviation "atty" and the filing of three checks that identified Greene as an attorney. As for his post-suspension conduct regarding his attitude toward the courts and practice, the Committee found his conduct was not "exemplary" and failed to meet the clear and convincing standard, focusing on his applications to the EPSB and Russellville Independent School District detailed above.

As to rehabilitation, the Committee also found Greene had failed to meet his burden. Noting the affidavits submitted on his behalf were from lawyers who had long known Greene or practiced with him on prior cases, the Committee found none of them "detailed as to how he has rehabilitated himself." The Committee also found Greene's lack of effort to mend his relationship with his son and daughter-in-law, as well as "repeated minimization of his wrongful actions" demonstrated he had not rehabilitated himself. Quoting *Lester v. Kentucky Bar Ass'n*, the Committee concluded his evidence was "exceedingly superficial" and "lacks substantial specific testimony which demonstrates that the applicant has rehabilitated himself." 532 S.W.2d 435, 437 (Ky. 1975).

Finally, the Committee found Greene had "not been candid with the Committee on multiple material issues[.]" The Committee cited to Greene's

9

failure to fully disclose the civil suits he was a party to and his insistence at the formal hearing on a false narrative of events surrounding the 2019 suspension (that we have repeatedly detailed).

**B. The Board of Governors' Findings and Recommendation**

The Board agreed with the Committee's recommendation to deny Greene's application for reinstatement. In so doing, the Board stated it "adopts, in large part, the findings of facts and conclusions of law" rendered by the Committee. It further stated, "Greene failed to show by clear and convincing evidence that he possesses the requisite remorse of his prior improper actions, [and] character and morality worthy of the public trust to be reinstated as an attorney in the Commonwealth."

The Board, however, disagreed with the Committee "related to Greene's compliance with the terms of the suspension order and the nature of Greene's prior misconduct." Simply put, according to the Board, "The Committee's Recommendation seeks to punish Greene twice for the same offenses when considering his compliance with the prior suspension order." In other words, the Board disagreed with the Committee's highlighting of Greene's illegal practice of the law in 2017, stemming from his 2016 suspension, which was in fact punished by our decision in 2019, suspending Greene for three years. The Board then stated, "While it is troubling that Greene continued to use his checking account and his attorney email for a period of time, the Board does not feel as if these violations, in and of themselves, rise to a knowing violation of the terms of his 2019 suspension."

10

Next, the Board chastised the Committee for "improper emphasis upon the nature of the previous misconduct underlying Greene's suspension." Although noting Greene's past misconduct involved misappropriating funds, practicing law while suspended, accepting funds while suspended, and lying about being suspended, the Board believed the Committee had come precariously close to "a re-litigation" of Greene's past conduct. The Board also believed the Committee had implied "previous transgressions automatically prevent redemption." Nonetheless, the Board otherwise adopted everything else in the Committee's findings and concluded that Greene should not be recommended for reinstatement.

## II.    Analysis

There are multiple standards to be considered for reinstatement including, but not limited to, the misconduct that was the basis for the suspension in the first place; compliance with terms of the suspension order; conduct during suspension demonstrating good character, trustworthiness, and confidence of the public, and sufficient professional capabilities; as well as appreciation for the wrongfulness of the misconduct committed, and candor. SCR 3.503(1).

The dispute between the Board and Committee is largely a distraction to the fundamental inquiry before us—"The ultimate and decisive question is whether the applicant is now of good moral character and is a fit and proper person to be reentrusted with the confidence and privilege of being an attorney at law." *In re Cohen*, 706 S.W.2d 832, 834 (Ky. 1986). Greene's illegal practice

11

of the law in 2017 was certainly relevant to the Committee's inquiry, but we agree that that behavior was punished in 2019 and the Committee ought to have focused more on any instances of illegal practice of the law after our decision was rendered in 2019. There are no instances cited by the Committee and it only mentions the use of an email address with the abbreviation "atty" in it, as well as a few checks made out that identified Greene as an attorney. It is unnecessary to decide whether these last two examples arise to a knowing violation of this Court's 2019 suspension order. It is clear to us that the Committee's central focus, and the Board's, was Greene's lack of candor, failure to appreciate his wrongdoing, and lack of rehabilitation in their refusals to recommend reinstatement.

Likewise, the Board's belief that the Committee had implied "previous transgressions automatically prevent redemption[,]" is a non-issue. The trouble with implications is that one reader may prove more astute in perceiving a disguised meaning, or conversely, that one reader may fancy himself more adept at discovering hidden things which are not in fact there. Whether the Committee did or did not imply past misconduct can automatically prevent redemption is inconsequential in light of our caselaw, that clearly states "the fact that one has transgressed does not forever place him beyond the pale of respectability." *In re May,* 249 S.W.2d 798 (Ky. 1952). We will "not follow a rule

so strict" and even for an attorney temporarily disbarred for a criminal offense we do "not close forever the door of opportunity" for reinstatement. *Id.*[2]

But the Committee's focus on Greene's prior conduct in 2017 was eminently necessary in light of the multiple instances of Greene's penchant for minimizing his misconduct, indeed even outright misrepresenting it. Green was required to "at least manifest a sense of wrongdoing. He should realize the seriousness of his prior conduct." *Cohen,* 706 S.W.2d at 834. His misrepresentation of the facts in the EPSB application and his minimization of his conduct in the Russellville Independent School application show that Greene does not appreciate the seriousness of his misconduct. His testimony to the Committee at the formal hearing which once again insisted on an account of the facts which Greene had previously admitted was false equally demonstrates a failure to appreciate the seriousness of his misconduct; and, what is more, is an egregious lack of candor. Additionally, Greene's failure to fully detail the civil cases in which he was a party, particularly the two cases filed against him in 2021 during the application process, are also instances of lack of candor.

Finally, the Committee's conclusion that Greene had not proven by clear and convincing evidence his rehabilitation is supported by the record. The Committee concluded that none of the affidavits in support of Greene detailed any specific steps or activities Greene had taken during his suspension in an

---

[2] Our rules do, however, prohibit reinstatement for an attorney who has received the ultimate sanction of permanent disbarment. SCR 3.380.

effort to rehabilitate himself. The Board adopted these findings. We therefore cannot say that Greene has rehabilitated himself.

### III.   Conclusion

For the aforementioned reasons, the recommendation of the Committee and Board of Governors is accepted, and we deny Greene's application for reinstatement at this time.

VanMeter, C.J.; Bisig, Conley, Keller, Lambert, Nickell, JJ., sitting. All concur. Thompson, J., not sitting.

ENTERED:  MARCH 23, 2023.

_____
CHIEF JUSTICE VANMETER

14